Filed 12/24/20  Marriage of Karayan & Serwer CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of PAUL KARAYAN and LAURA SERWER. | |
| PAUL KARAYAN,<br><br>        Appellant,<br><br>v.<br><br>LAURA SERWER,<br><br>        Respondent. | A160107<br><br>(San Mateo County<br>Super. Ct. No. 17 FAM 03160) |

Paul Karayan (Paul) appeals from an order that changes the last name of the six-year-old child of his former marriage with Laura Serwer (Laura) from Serwer Karayan to Serwer-Karayan. Laura's surname will thus no longer be one of the boy's middle names but part of his new, hyphenated surname. Although the requisite evidence in the record is meager, we shall affirm because the evidence satisfies the deferential standard of review.

**Factual and Procedural History**

Paul and Laura married in September 2010; their son was born in December 2013; and they separated in May 2017. The court entered a bifurcated judgment dissolving their marriage in December 2018 and a final judgment on reserved issues in June 2019. In August 2019, they agreed to share physical and legal custody of their son. Paul later married Jamie Pereyda (Jamie), who began using his surname.

In August 2019, the parties discussed with a coparenting counselor the issue of emergency-contact forms. Their son then had two middle names, of which the second, Serwer, is Laura's surname, which she retained during the marriage. Laura asked Paul to agree to change their son's surname to Serwer-Karayan; he declined. In early September, the parties discussed the surname dispute with the counselor and agreed on a protocol for using their son's full name on school and extracurricular forms if possible.

Later that month, Laura filed a request for order (RFO) asking the court to order (1) that the boy's surname be changed to Serwer-Karayan and (2) that, on all forms, both parents use their son's full name and list each other as first or second emergency contact. Laura based her request on a declaration alleging that Paul "often fills out emergency and contact forms for [the child]'s providers and leaves 'Serwer' out" and "lists his wife [Jamie] as a contact, sometimes to the exclusion of me," while sometimes giving Jamie's last name as "Karayan." Her memorandum also cited a passage in *In re Marriage of Schiffman* (1980) 28 Cal.3d 640, 647 (*Schiffman*) noting that use of the maternal surname may support the mother-child relationship.

Paul opposed the name-change request but declared that he had no substantive objection to the two other requests. He insisted that no one had ever experienced confusion about Laura's and Jamie's respective roles and contended that Laura's motive for requesting the order was a desire to prevent Jamie's recognition as the boy's stepmother, noting an incident in which Laura crossed out the designation "stepmom" next to Jamie's name on a school form and, next to her own name, wrote "[*child's first name*]'s only mom." Paul added that his family fled Turkey during the Armenian genocide and that his son is the lone member of his generation who can carry on the Karayan surname.

Laura replied that making Serwer part of her son's last name would "reflect [his] relationship with both of his parents and extended families" and "honor[] both sides of [his] heritage," including her Jewish ancestry. She quoted the following passage from *Schiffman*: "In recognizing a father's right to have his child bear his surname, courts largely have ignored the impact a name may have on the mother-child relationship. Perhaps that is because mothers, usually given custodial preference in the past, generally had more regular contact and could maintain a psychological relationship without the need for the tie a surname provides. However, 'the maternal surname might play a significant role in supporting the mother-child relationship, for example, in the cases where the father is the custodial parent or *where the custodial mother goes by her birth-given surname*.' [Citation.] [The mother in this case] uses her birth name; and [the child's] future friends, neighbors, teachers, acquaintances, and family indeed may associate [the child] with [that surname] rather than [her father's surname]. The trial court apparently failed to weigh those considerations and relied exclusively on the anachronistic, father's 'primary right' theory to decide the issue." (*Schiffman*, *supra*, 28 Cal.3d at pp. 647–648.)

The trial court granted Laura's RFO in full. On the lone contested issue of the surname change, it explained: "I don't think that there is an issue concerning the change of the name based on the child's young age. I think it will be a very minor disruption to [him]. Also, I did review, specifically, the issues around the mother having her name have a role in the child's name, and the case law on that I also found to be persuasive." Paul then filed a timely notice of appeal.

**Discussion**

In *Schiffman, supra,* 28 Cal.3d 640 our Supreme Court eliminated the common-law presumption that a child born in wedlock should bear the father's surname. "Henceforth, as in parental custody disputes, the sole consideration when parents contest a surname should be the child's best interest. . . . [¶] Under the test thus revised the length of time that the child has used a surname is to be considered. [Citation.] If . . . the time is negligible because the child is very young, other facts may be controlling. For instance, the effect of a name change on preservation of the father-child relationship, the strength of the mother-child relationship, and the identification of the child as part of a family unit are all pertinent. The symbolic role that a surname other than the natural father's may play in easing relations with a new family should be balanced against the importance of maintaining the biological father–child relationship. '[T]he embarrassment or discomfort that a child may experience when he bears a surname different from the rest of his family' should be evaluated." (*Id.* at p. 647.) As Laura emphasizes, the court continued: " 'the maternal surname might play a significant role in supporting the mother-child relationship . . . *where the custodial mother goes by her birth-given surname.*' " (*Ibid.*) The mother in *Schiffman* did so, and the court noted that the child's "future friends, neighbors, teachers, acquaintances, and family indeed may associate [the child] with [that surname] rather than [the father's surname]." (*Id.* at p. 648.)

In this case, the trial court stated without elaboration that it had reviewed "the issues around the mother having her name have a role in the child's name," and that "the case law on that I also found to be persuasive." *Schiffman* identifies two distinct benefits of making the mother's name part of the child's name: the matching surnames will further "the identification of

4

the child as part of a family unit" with the mother in the eyes of family, friends, teachers, and others, and " 'the maternal surname might play a significant role in supporting the mother-child relationship.' " (*Schiffman, supra*, 28 Cal.3d at p. 647.)

Laura did not submit any evidence and did not seriously contend that a name change was needed to bolster the mother/child relationship. Nor does she make any such contention on appeal. To the contrary, she asserts that "[t]he fact that the parties share joint legal and physical custody of [the child] such that they each presumably have a close relationship with [him], means that neither needs [him] to use his or her name alone to support a connection to him."

Laura contends that it is in her son's best interest to incorporate her surname into his surname because the hyphenated surname will facilitate the child's identification as part of her family unit and will thereby avert potential confusion if she has to pick him up in an emergency. Laura did not offer evidence of any such confusion having arisen in the past. She did submit two forms that Paul had filled out in May 2019 for a summer camp the minor attended.

On the "Identification and Emergency Information" form Paul put Jamie's name on a line designated for "Father's/Guardian's/Father's Domestic Partner's Name"; wrote "N/A" in the line for "Mother's/Guardian's/Mother's Domestic Partner's Name"; and listed his own name as the "Person Responsible for Child." In a section at the bottom of the form titled "Names of Persons Authorized to Take Child From the Facility," Paul listed himself as "Father"; Jamie as "Stepmother"; Jamie's mother as "Stepmother's parent"; Paul's parents as "Grandparents"; and Laura as "Mother."

On the "Enrollment Agreement" form, Paul gave his name and contact information in the "Primary Contact and Release Person" section. In the "Emergency Contact and Release Persons" section, he listed Jamie (labeled "Mother, step"), his mother, and Jamie's mother as the persons "authorized to pick up your child if there is a medical or other emergency and you cannot be reached." He did not list Laura on the form. In response to Laura's RFO, Paul contended that he had filled out the form as he did because on his custodial days Laura works in Boston, and she has no family in the Bay Area.

Laura does not contend that this form caused any confusion as to whether she or Jamie is the boy's mother, nor does she contend that she was likely to pick up her son from summer camp in the Bay Area while she was working in Boston. Nonetheless, she argued below that Paul's failure to list her as an emergency contact is troubling. Paul responded to the RFO by acknowledging the propriety of including the names of both parents on all forms, using their son's full name (including "Serwer" as his middle name), and listing one another as the first or second emergency contact and authorized pickup. The court included these provisions in its order.

As is evident, there is little in the record that emphatically commands a conclusion one way or the other as to whether the name change is in the boy's best interest. On one hand is the proposition that Paul cites from *Donald J. v. Evna M.* (1978) 81 Cal.App.3d 929, that "[w]here a child has used a particular surname for a substantial period of time without objection by either natural parent, the court, upon petition of one [parent] . . . , should exercise its power to change the child's surname reluctantly, and only where the substantial welfare of the child requires the change." (*Id.* at p. 937.)[1] On the other hand is

_____

[1] Justice Mosk cited *Donald J. v. Evna M., supra,* 81 Cal.App.3d 929, 937 in his concurring opinion in *Schiffman.* (*Schiffman, supra,* 28 Cal.3d at

the deference owed to the judgment of the trial court, whose decision must be upheld if supported by substantial evidence. (*In re Marriage of McManamy & Templeton* (1993) 14 Cal.App.4th 607, 610; *In re Marriage of Douglass* (1988) 205 Cal.App.3d 1046, 1055.)

The minor was six years of age when this matter was before the trial court. While he was not an infant unaware of his name, neither had he acquired a reputation in school, business, or any other context associated with his given name. He unquestionably would be aware of the change, but there is no evidence that the change is or is not likely to cause distress to the minor, much less stress of lasting significance. Nor is there evidence that the name change is necessary to avoid stress or other adverse impacts to the minor.

Nonetheless, there is no basis to reject the trial court's implicit finding that including Laura's surname as part of her son's surname may further avert confusion or minimize delay if she needs to pick him up from school or from a care provider. The shared surname will in all events make her connection to her son immediately clear to any caregiver or temporary custodian. And, as in *Schiffman, supra*, 28 Cal.3d at page 647, the hyphenated surname will further "the identification of the child as part of a family unit" with her. His "friends, neighbors, teachers, acquaintances, and family indeed may associate" him with his mother's surname.

_____

p. 650 (conc. opn. of Mosk, J.).) Justice Mosk urged the adoption of a "presumption that the custodial parent is acting in the child's best interest when selecting his [or her] name" at birth—a presumption that would thereafter "maintain the status quo, unless a showing can be made that the child's welfare would thereby be harmed." (*Ibid.*) The majority in *Schiffman* did not adopt this presumption, instead holding that "the sole consideration when parents contest a surname should be the child's best interest." (28 Cal.3d at p. 647.) Accordingly, this court is not free to accept Paul's alternative argument that we should resolve this appeal by adopting and applying such a presumption.

Paul contends that accepting Laura's position amounts to adopting a rule that "any divorced parent [can] obtain a hyphenated [sur]name" upon request, obviating the best-interest-of-the-child inquiry mandated by *Schiffman*. But while the factor on which Laura relies may always support a request for a hyphenated name, recognizing the benefit of better identification with the mother's family does not preclude consideration of countervailing concerns. In this case, Paul failed to counter Laura's showing that a name change will afford the identification benefits noted in *Schiffman* with any evidence that such a change will have any detrimental effect.

In sum, although the question is by no means free from doubt, we conclude that sufficient evidence supports the trial court's finding that the change in surname is in the best interests of the child.

## Disposition

The order is affirmed.


POLLAK, P. J.

WE CONCUR:

STREETER, J.
BROWN, J.

8